UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Javier Acosta,                   :      Civil No. 1:15-CV-01125
                                 :
           Plaintiff,            :      (Judge Kane)
                                 :      (Magistrate Judge Saporito)
      v.                         :
                                 :
Commissioner of Social Security,:
                                 :
           Defendant.            :

REPORT AND RECOMMENDATION

I.   INTRODUCTION:

Plaintiff Javier Acosta ("Mr. Acosta"), an adult individual who

resides within the Middle District of Pennsylvania, seeks judicial review

of the final decision of the Commissioner of Social Security

("Commissioner") denying his claims for Disability Insurance Benefits and

Supplemental Security Income under Titles II and XVI of the Social

Security Act.  Jurisdiction is conferred on this Court pursuant to 42 U.S.C.

§405(g) and 42 U.S.C. §1383(c)(3).

This matter has been referred to the undersigned United States

Magistrate Judge to prepare a report and recommended disposition

pursuant to the provisions of 28 U.S.C. §636(b) and Rule 72(b) of the

1

Federal Rules of Civil Procedure.  For the reasons expressed herein, we have found that the final decision of the Commissioner of Social Security is not supported by substantial evidence.  Accordingly, it is recommended that the final decision of the Commissioner denying Mr. Acosta's claim be VACATED and this case be REMANDED for a new administrative hearing.

II.    BACKGROUND & PROCEDURAL HISTORY:

Mr Acosta has a high school education, and previously worked as a cleaner/housekeeper, building maintenance repair person, and machine repairer.   He reported that he stopped working on December 6, 2013, when he was only thirty-four years old, due to the combined symptoms of various medical conditions.   He filed an application for disability insurance benefits under Title II of the Social Security Act on December 30, 2013.  In his application Mr. Acosta alleged that he had been disabled, or unable to work, since December 6, 2013, as the result of the following conditions: toe amputations, uncontrolled diabetes, severe neuropathy, eye hemorrhage (secondary to diabetes), eye surgery, severe arthritis, nerve damage, and dizziness.  (Admin. Tr. 165).

Mr. Acosta alleges that he has difficulty walking and standing secondary to pain and diabetic neuropathy, and difficulty seeing secondary to diabetic retinopathy.  Mr. Acosta testified that he could walk between two and three city blocks at one time before he must stop due to his symptoms, stand between thirty and forty-five minutes before he experiences pins and needles, and sit for forty-five minutes to one hour at a time. (Admin Tr. 70-71).  Mr. Acosta reported that he walks with a cane that was prescribed in January 2014.  (Admin. Tr. 195).  During his hearing, however, he testified that he uses his cane between three and four days per month if he is in pain.  (Admin. Tr. 74).  He also reported balance problems following the second amputation such that he could not stand for more than twenty minutes without a cane.  Id.  Mr Acosta testified that he could not lift anything heavier than one gallon of milk (slightly less than nine pounds) because to do so could cause him to develop eye hemorrhages and cloudy vision.  (Admin. Tr. 71).  He also reported that he receives monthly eye injections, and that as a side-effect he "can't really see" for three days following the injection. (Admin. Tr. 72).  As a result of his impairments, he requires assistance dressing when his

pain is severe, and does not go out alone because he needs assistance if his sugar levels drop suddenly.  Despite his impairments, Mr. Acosta is able to drive short distances (i.e., fifteen miles), stay home and care for his four-year-old twins, watch television with the twins, read twice per week, and go grocery shopping with his wife (using a motorized cart), and goes to church, family gatherings, and attends doctor's appointments.

As far as his medical treatment, Mr. Acosta's care is managed by a number of different physicians.  He sees, or has seen, ophthalmologists Marc J. Spirn ("Dr. Spirn") and Carl D. Regillo ("Dr. Regillo"), endocrinologist Ronald Pyram ("Dr. Pyram"), and podiatrists Tanjila Matin ("Dr. Matin") and Thomas Berryman ("Dr. Berryman").

On June 29, 2011, Mr. Acosta underwent a right side vitrectomy for an increasing vitreous hemorrhage.[1]  (Admin. Tr. 288). In January 2012, Dr. Spirn noted that Mr. Acosta was "doing well at 20/30 in both eyes," and had good panretinal photocoagulation with an attached retina and no vitreous hemorrhage, but had pterygium in both eyes, trace nuclear

---

[1] A vitreous hemorrhage occurs when there is bleeding into the vitreous body (clear gel that occupies the space between the lens and retina) and is sometimes caused by diabetic retinopathy.  <u>Dorland's Illustrated Medical Dictionary</u> 842 (32nd ed 2012).

sclerosis, and scattered retinal hemorrhage in his left eye.  Id.

On August 22, 2012, Mr. Acosta was admitted to the Pocono Medical Center with a right foot wound.  On August 24, 2012, Mr. Acosta had his right fifth toe amputated due to a diabetic ulceration. (Admin. Tr. 294-95, 296, 298, 306-07).  A laboratory study confirmed the diagnosis of chronic osteomyelitis and focal acute osteomyelitis. (Admin. Tr. 293).  He was discharged from the hospital on August 26, 2012, with the diagnoses of gangrene, diabetic foot ulcer, status post amputation of 5th digit right foot, type II diabetes mellitus, and severe diabetic neuropathy. (Admin. Tr. 401).

On September 11, 2012, Dr. Berryman noted that the site of Mr. Acosta's right fifth toe amputation was healing well. (Admin. Tr. 310). One week later, however, Mr. Acosta returned to Dr. Berryman with increased swelling in his right foot with no pain. (Admin. Tr. 311).  A September 21, 2012, MRI revealed an altered marrow signal of the fifth metatarsal suspicious for osteomyelitis. (Admin. Tr. 317, 397-99).  Dr. Berryman noted that Mr. Acosta could return to work on October 12, 2012. (Admin. Tr. 322).

On June 20, 2013, Mr. Acosta was examined by Dr. Peter Regillo with complaints of decreased vision on the left side.  His uncorrected visual acuity on the left side was 20/400.  (Admin. Tr. 520).  Dr. Regillo recommended an anti-VEGF injection for the left eye, noted that both eyes would need panretinal laser treatment within the next week or two, and that Mr. Acosta may need vitrectomy surgery on his left eye if the hemorrhage did not improve.  (Admin. Tr. 520).  Mr. Acosta's uncorrected visual acuity in his right eye at this visit was 20/25-2.  Id.

Mr. Acosta experienced additional diabetes-related complications in his right foot in October 2013, and was referred to Dr. Matin by his endocrinologist for diabetic foot care.  Mr. Acosta was examined by Dr. Matin approximately twelve times between October 2013 and January 2014, underwent frequent debridement of the right fourth  toe, a partial amputation of the right fourth toe, and a total amputation of the right fourth toe on January 31, 2014.[2]  (Admin. Tr. 494-505).  On February 4,

_____

[2]Notable during this period is that on December 6, 2013, Mr. Acosta's alleged onset date, he was seen at the hospital by Dr. Matin after his "leg just gave out on him" at work.  (Admin. Tr. 499).  Although it is unclear whether Mr. Acosta's fall was related to his toe ulcer and chronic osteomyelitis, Dr. Matin's records reflect that an x-ray confirmed erosion in the distal tuft of Mr. Acosta's right fourth toe, that Mr. Acosta had very

2014, Dr. Matin noted that the incision looked good, the sutures were intact, and that there were no signs of infection, edema, or erythema. (Admin. Tr. 494). On February 20, 2014, Dr. Matin noted that the incision looked good, the sutures were intact, and that there were no signs of infection, edema, or erythema. (Admin. Tr. 493). Several months later, Dr. Matin completed a medical source statement in which he assessed physical limitations consistent with less than sedentary work.

On January 30, 2014, Mr. Acosta was examined by Dr. Regillo with complaints of active hemorrhaging in his right eye and decreased vision despite recent photocoagulation laser surgery and an Avastin injection. (Admin. Tr. 518). Mr. Acosta's uncorrected visual acuity on the right side was 20/400 with increased vitreous hemorrhage. Id. Dr. Regillo recommended a right side vitrectomy. Id. Mr. Acosta's uncorrected vision in his left eye on that date was 20/40. Id. Although he reported "flashes" and floaters" Mr. Acosta's uncorrected vision on August 27, 2014, was

---

swollen feet that day, and that Mr. Acosta had a fever and chills for several days. Id. Dr. Matin assessed that Mr. Acosta was most likely septic, and instructed Mr. Acosta to go to the emergency department for removal of the eroded phalanx and for a bone culture. (Admin. Tr. 500).

20/70-1 in his right eye and 20/200 in his left eye. (Admin. Tr. 606).

In connection with the initial administrative review of his claims, the evidentiary record was evaluated by State agency medical consultant Sharon A. Wander on March 13, 2014.[3]   Dr. Wander completed an assessment of what she anticipated Mr. Acosta's RFC would be twelve months after the alleged onset of his disabling impairments based on the evidence that was available on March 13, 2014. (Admin. Tr. 101-04). Dr. Wander opined that Mr. Acosta could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk (with normal breaks) up to four hours per eight-hour workday; sit (with normal breaks) for a total of six hours per eight-hour workday; occasionally climb

---

[3] As noted by Mr. Acosta, the medical consultant code in Dr. Wander's RFC assessment reveals that Dr. Wander's area of specialty is pediatrics. See Social Security Programs Operations Manual System ("POMS") DI 24501.004. To the extent that Mr. Acosta suggests that Dr. Wander's specialty renders her generally less qualified to assess his physical impairments due to medical specialty, we find that this suggestion lacks merit. While a specialty in the particular area of a claimant's impairment may be a basis to accord greater weight to a medical opinion, see 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5), Dr. Wander has a medical degree and is therefore an acceptable medical source qualified to offer an opinion on the existence of any impairment. 20 C.F.R. §§ 404.1513, 416.913. Although it may be helpful in some cases, we have found nothing in the regulations that prohibits the use of an opinion of a pediatrician in an adult disability case.

ramps or stairs, stoop, kneel, crouch, and crawl; never balance, and climb ladders, ropes or scaffolds.  Dr. Wander also noted that Mr. Acosta was limited in his ability to operate foot controls with his lower right extremity, and had limited near acuity, limited far acuity, limited depth perception, limited accommodation, limited color vision, and limited field of vision in his right eye.  Dr. Wander explained that Mr. Acosta's exertional limitations were the result of his history of diabetes, chronic right foot wound with osteomyelitis, toe amputations, and severe diabetic peripheral neuropathy. She explained that Mr. Acosta's visual limitations were due to his history of proliferative diabetic retinopathy in the right eye, with a history of vitrectomy for increasing vitreous hemorrhage.  Dr. Wander also opined that Mr. Acosta could only work in environments where he could avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, pulmonary irritants, and hazards.

Mr. Acosta's Title II application was denied on March 20, 2014.

On May 6, 2014, Mr. Acosta filed an application, for supplemental security income, under Title XVI of the Social Security Act.  This application was not included in the administrative record, however the

ALJ's written decision reflects that she evaluated Mr. Acosta's Title XVI claim together with his Title II claim, and that Mr. Acosta's allegations in his Title XVI application were identical to his Title II claim.

Mr. Acosta's treating podiatrist, Dr. Matin completed a medical source statement of Mr. Acosta's physical capacity on May 14, 2014. (Admin Tr. 591-94).   We note at the outset that pursuant to the Commissioner's regulations, a podiatrist is considered an "acceptable medical source" qualified to render a medical opinion only to the extent that the opinion addresses issues within the scope of his or her medical practice under state law (i.e., foot or foot and ankle).  See 20 C.F.R. §§ 404.1513(a)(4), 416.913(a)(4).   Pennsylvania law limits the practice of podiatry to treatment of the foot, and those anatomical structures of the leg governing the functions of the foot.   63 Pa. Stat. Ann. § 42.2.  In her check-box medical source statement, Dr. Matin stated that Mr. Acosta's current diagnoses include diabetes mellitus, ulcers, osteomyelitis, and amputation, that his prognosis is poor, and that his symptoms include pain and swelling of right toes, balance issues due to amputation, and chronic osteomyelitis. (Admin Tr. 591-94).  Dr. Matin assessed that Mr.

Acosta's symptoms would constantly interfere with the attention and concentration required to perform simple work-related tasks. Id. She also estimated that Mr. Acosta would be able to: sit one hour per eight-hour workday; stand one hour per eight-hour workday; walk zero hours per eight-hour workday; engage in simple grasping with his hands for fifty percent of an eight-hour workday; push or pull with his upper extremities for fifty percent of an eight-hour workday; engage in fine manipulation of objects with his upper extremities for thirty percent of an eight-hour workday; never use his feet for repetitive movements (e.g., operating foot controls); occasionally lift or carry between five and ten pounds; occasionally bend, squat, crawl, and reach; and never climb. Id. Dr. Matin also assessed that Mr. Acosta would need to take unscheduled breaks during the workday because he needs to be off his feet most of the day to prevent further amputations, and could tolerate environments where he would have no more than moderate exposure to unprotected heights, being around moving machinery, and exposure to pulmonary irritants (i.e., dust, fumes, gases), could tolerate no exposure to marked changes in temperature and humidity, and could not drive automotive

11

equipment.  Id.

Upon Mr. Acosta's request, a hearing was convened before ALJ Michele Wolfe in Wilkes-Barre, Pennsylvania on November 10, 2014.  Mr. Acosta appeared with an attorney and was given an opportunity to testify. Impartial vocational expert Carmine Abraham ("VE Abraham") also appeared and testified.

The ALJ denied Mr. Acosta's claims in a written decision on December 16, 2014.  Thereafter, Mr. Acosta sought review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review.  Mr. Acosta's request for review was denied on April 7, 2015. The Appeals Council's denial makes the ALJ's December 2014 decision the final decision of the Commissioner of Social Security subject to judicial review by this Court.

On June 9, 2015, Mr. Acosta initiated this action by filing a complaint.  (Doc. 1).  In his complaint, Mr. Acosta seeks a judgment for such relief as may be proper.  (Doc. 1 ¶2).  On August 10, 2015, the Commissioner filed her answer, in which she argues that the ALJ's written decision was made in accordance with the applicable law and

regulations, and that the ALJ's findings of fact are supported by substantial evidence.  (Doc. 11 ¶5).  Together with her answer, the Commissioner filed a certified copy of the transcript of the entire record of proceedings relating to this case.  (Doc. 12).

This matter has been fully briefed by the parties, and is now ripe for decision.  (Doc. 13; Doc. 14).

III.   Legal Standards;

   A.   Substantial Evidence Review – the Role of This Court:

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance

of the evidence but more than a mere scintilla.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."  <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole."  <u>Leslie v. Barnhart</u>, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003).  The question before this Court, therefore, is not whether Mr. Acosta is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law.  <u>See</u> <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted);

<u>Burton v. Schweiker</u>, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

B.   <u>Initial Burdens of Proof , Persuasion and Articulation for the ALJ</u>:

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§ 404.1505(a), 416.905(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a),

416.905(a).  To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured.  42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.  20 C.F.R. §§404.1520(a), 416.920(a).  Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC.  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v.

Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. §423(d)(5); 42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §§404.1512, 416.912; Mason, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

IV. DISCUSSION:

A. THE ALJ'S DECISION DENYING MR. ACOSTA'S CLAIMS:

In her December 2014 decision denying Mr. Acosta's claims, the ALJ found that Mr. Acosta meets the insured status requirements of Title II of the Social Security Act through December 31, 2017. (Admin. Tr. 50).

At step one of the sequential evaluation process the ALJ found that Mr. Acosta had not engaged in substantial gainful activity between December 6, 2013 (Mr. Acosta's alleged onset date), and the date the ALJ issued her decision. At step two of the sequential evaluation process, the ALJ found that Mr. Acosta had the following medically determinable severe impairments: right foot osteomyelitis, status post fourth right toe amputation and history of fifth right toe amputation, diabetes mellitus, diabetic peripheral neuropathy, obesity, proliferative diabetic retinopathy, vitreous hemorrhage, status post pars plana vitrectomy ("PPV") laser and panretinal photocoagulation, and diabetic macular edema. (Admin. Tr. 50-51). The ALJ also found that Mr. Acosta had the following medically determinable but non-severe impairments: bacteremia, supraventricular tachycardia ("SVT"), hypertension; hypercholesterolemia, dyslipidemia, right thigh cellulitis, and cataracts. (Admin. Tr. 51). At step three of the sequential evaluation process, the ALJ found that Mr. Acosta did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). (Admin. Tr. 51).

Between steps three and four of the sequential evaluation process the ALJ assessed Mr. Acosta's RFC.  The ALJ found that Mr. Acosta retained the capacity to engage in a range of sedentary work as defined by 20 C.F.R. §§ 404.1567(a) and 416.967(a) despite his impairments, except that:

> He can stand and walk within sedentary exertion but standing would need to be limited per any interval to a maximum of 30 minutes, with no limits on sitting, and walking would need to be limited to short distances and a maximum of 15 minutes at a time.  He must avoid occupations requiring pushing/pulling with the right lower extremity.  He can occasionally push/pull with the left lower extremity.  He can occasionally stoop, crouch, crawl, kneel, climb, but never on ladders, ropes, or scaffolds, and never balance.  He must avoid concentrated exposure to temperature extremes of cold/heat, wetness, and humidity.  He must avoid even moderate exposure to vibrations and hazards including moving machinery and unprotected heights.  He work should be limited to only occasional use of computer monitors or other types of work with documenting things on paper, reading, or writing things.

(Admin. Tr. 52).

The ALJ's findings at steps four and five of the sequential evaluation process were informed by testimony from VE Abraham.  In response to a series of hypothetical questions posed by the ALJ, VE Abraham testified that an individual with the above RFC would not be able to engage in Mr.

Acosta's past relevant work as a housekeeper/cleaner (medium), building maintenance and repairer (medium), and machine repairer (heavy). (Admin. Tr. 81-83). Accordingly, the ALJ found that Mr. Acosta could not engage in any of his past relevant work because "heavy" and "medium" work exceed the demands of "sedentary" work. (Admin. Tr. 55); see 20 C.F.R. §§ 404.1567, 416.967 (defining heavy, medium, and sedentary work). VE Abraham also testified that, an individual with the above RFC who is the same age, and has the same education and work experience as Mr. Acosta could adjust to other work, including the occupations of information clerk (DOT #237.367-046), bench assembler (DOT #715.684-026), and inspector (DOT #726.684-050). (Admin. Tr. 85-86). VE Abraham also testified that there are approximately 10,000 information clerk jobs in the state and 600 in the region, 13,000 bench assembler jobs in the state and 500 in the region, and 14,000 inspector jobs in the state and 500 in the region. Id. Accordingly, the ALJ found that Mr. Acosta could adjust to other work that exists in the national economy in significant numbers. (Admin. Tr. 56).

B.   THE ALJ DID NOT ADEQUATELY EXPLAIN HER DECISION TO DISCOUNT THE OPINION OF MR. ACOSTA'S TREATING PODIATRIST:

21

Mr. Acosta argues that the ALJ incorrectly relied on the March 2014 physical RFC assessment of non-examining source Dr. Wander while according "no weight" to the medical source statement by Dr. Matin.  In support of his position, Mr. Acosta aptly notes that the Commissioner's regulations express a clear preference for treating source opinions, and that "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  SSR 96-6p, 1996 WL 374180 at *2; see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)(codifying the treating physician rule); SSR 96-2p, 1996 WL 374188 (explaining when treating physician opinions are entitled to controlling weight).  "For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources."  SSR 96-6p, 1996 WL 374180 at *2.

This case, however, presents a unique scenario because the "treating physician" whose opinion is at issue is a podiatrist rather than a medical doctor.  As discussed above, a podiatrist is considered an "acceptable

medical source" or a source qualified to render an expert medical opinion only to the extent that his or her opinion addresses the patient's feet.[4]  In this case, Dr. Matin completed a check-box type medical source statement which addressed limitations related to Mr. Acosta's osteomyelitis and lower extremity diabetic neuropathy, as well as limitations related to other areas of the body which fall outside of Dr. Matin's area of expertise. Thus, her medical source statement includes a mixture of treating source opinions related to Mr. Acosta's feet and lay opinions about other body parts.

The ALJ accorded "no weight" to Dr. Matin's medical source statement, at least in part, because "the limitations this doctor gives for sitting and for the hands when this is a foot doctor lessens the credibility of the whole form," (Admin. Tr. 55), without discussing whether or to what extent the medical source statement constituted a treating source opinion. We are called upon to decide whether it is proper for an ALJ to discount

---

[4] The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

a medical source statement from a treating podiatrist in its entirety because it contains a mixture of treating source opinions and lay opinions.

It is beyond dispute that, in a social security disability case, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. This principle applies with particular force to the opinion of a treating physician. See 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)(quoting Mason, 994 F.2d at 1066)); see also Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Although there are very few cases that address the issue presented here, SSR 96-5p cautions us that in cases where an acceptable medical source provides a medical source statement that addresses issues reserved to the Commissioner as well as medical opinions, "[a]djudicators must remember, . . ., that medical source statements may actually comprise separate medical opinions regarding

diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one." 1996 WL 374183. We find that the same logic should apply where a podiatrist authors a medical source statement that contains a mixture of treating source and lay opinions. An ALJ should not be permitted to reject a medical source statement wholesale simply because it is a mixture of treating and lay opinions. Accordingly, we recommend that this case be remanded for further review of Dr. Matin's medical source statement.

As for the other bases cited by the ALJ in support of her decision to discount Dr. Matin's opinion, we find that the ALJ did not sufficiently explain her rationale in concluding, which limitations, and to what extent, Dr. Matin's medical assessment was not well-supported by the record, or why she found it significant that the opinion was rendered less than twelve months from Mr. Acosta's alleged onset date.

On remand, the ALJ should determine the extent to which Dr. Matin's opinions are those of a treating source, and evaluate them as required under the controlling law and regulations. However, nothing in

this report should be construed as suggesting what the ultimate outcome of this analysis should be.

C.   The ALJ's Decision At Step Five is Not Supported By Substantial Evidence:

Mr. Acosta next raises an objection related to the ALJ's conclusion at step five of the sequential evaluation process that he retained the capacity to adjust to "other work" that exists in significant numbers in the national economy.   The ALJ's conclusion that Mr. Acosta could adjust to other work was based on the testimony provided by VE Abraham.   Mr. Acosta argues that this testimony cannot form the basis of a substantial evidence determination because the ALJ failed to adequately account for the full extent his credibly established visual limitations.   (Doc. 13 at 12-15).

It is well-established in the Third Circuit that where a VE's testimony forms the basis of an ALJ's substantial evidence determination, that the hypothetical question which elicited the VE's response must accurately reflect all of a claimant's credibly established limitations. Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005)(quoting Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002)).   Rutherford also clarifies,

however, that an ALJ is not required to submit every impairment alleged by a claimant before relying on VE testimony.  <u>Rutherford</u>, 399 F.3d at 554.  This distinction is a subtle but important one, as the ALJ is only required to accurately convey only those limitations that are credibly established in the record to a VE for the VE's response to form the basis of a substantial evidence determination.  <u>Id.</u>  Credibly established limitations are:

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response (<u>Burns</u>, 312 F.3d at 123). Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence (<u>Plummer</u>, 186 F.3d at 429). Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible—the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir.1993); Reg. § 929(c)(4)). Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it (Reg. § 929(c)(3)).

<u>Id.</u>

The parties do not dispute that the ALJ credited some degree of limitation to Mr. Acosta's ability to engage in tasks requiring near visual acuity.  Mr. Acosta argues, however, that the ALJ did not accurately convey his limited near acuity to the VE when she posed a hypothetical question limiting him to "only occasional use of computer monitors or other types of work with documenting things on paper, reading, or writing things," rather than articulating a more general limitation to only occasional near acuity.[5]  (Admin. Tr. 52).

In response, the Commissioner argues that the ALJ's RFC assessment adequately accounted for Mr. Acosta's credibly established visual limitations, and that there is no evidence that his visual limitations would prevent him from performing work that required only occasional use of computer monitors or other types of work with documenting things

---

[5] Near acuity is defined as "clarity of vision at 20 inches or less.  <u>See</u> Department of Labor, <u>Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles</u>, C-4 (1993) available on WestlawNext at SCODICOT Appendix C.

 "Occasionally" is defined as an activity or condition that exists up to 1/3 of the time. <u>Id.</u> at C-3. "Frequently" is defined as an activity or condition that exists from 1/3 to 2/3 of the time. <u>Id.</u> "Constantly" is defined as an activity or condition that exists 2/3 or more of the time. <u>Id.</u>

on paper, reading or writing things.  (Doc. 14 at 21).  In fact, Mr. Acosta "does not dispute the ALJ's visual limitations *as far as they go*," (Doc. 13 at 13)(italics in original), he simply argues that the practical effects of his poor near acuity extend to activities beyond those specifically identified by the ALJ in her RFC assessment.

Ultimately, we find that the ALJ erred by failing to discuss or explain why she chose to impose a specific, rather than a more general, visual limitation.  Her failure in this regard makes it impossible for this Court to conduct any meaningful review of her decision, or reconcile the apparent dissonance between the ALJ's assessment that Mr. Acosta had a severe visual impairment affecting his ability to read, write, and use a computer monitor, and the ALJ's reliance on VE Abraham's testimony that Mr. Acosta could adjust to "other work" that required a capacity for "frequent" or "constant" near acuity.  See DOT #237.367-046, 1991 WL 672194 (indicating that work as an information clerk requires the capacity for frequent near acuity); DOT #715.684-026, 1991 WL 679344 (indicating that work as a bench hand requires the capacity for constant near acuity); DOT 726.684-050, 1991 WL 679601 (indicating that work as a film touch-

up inspector requires constant near acuity).

V.    <u>RECOMMENDATION</u>:

Based on the foregoing, we recommend that the Commissioner's decision should be VACATED and this case should be REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings as follows:

(1)    The appropriate remedy in this case is to remand this matter to the Commissioner to conduct a new administrative hearing;

(2)    The Clerk of Court should be directed to enter final judgment in Mr. Acosta's favor, and against the Commissioner of Social Security.

<u>s/ Joseph F. Saporito, Jr.</u>
JOSEPH F. SAPORITO, JR.
U.S. Magistrate Judge

Dated: May 12, 2016

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Javier Acosta,                           :          Civil No. 1:15-CV-01125
                                         :
              Plaintiff,                 :          (Judge Kane)
                                         :          (Magistrate Judge Saporito)
     v.                                  :
                                         :
Commissioner of Social Security,         :
                                         :
              Defendant.                 :

NOTICE

Notice is hereby given that the undersigned has entered the

foregoing Report and Recommendation dated May 12, 2016.  Any party

may obtain a review of this Report and Recommendation pursuant to

Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings,  recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in

whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely Objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

 s/ Joseph F. Saporito, Jr.
JOSEPH F. SAPORITO, JR.
U. S. Magistrate Judge